**FILED**

**SEPTEMBER 26, 2007**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**FILED**

J N

SEP 2 6 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Suppressed, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| v. | ) | Chief Judge James Holderman |
| | ) | |
| Suppressed, | ) | |
| | ) | ***QUI TAM* CASE UNDER SEAL** |
| Defendant. | ) | **PURSUANT TO THE FALSE CLAIMS ACT** |
| | ) | |
| | ) | |
| | ) | 07CV5425 |
| | ) | JUDGE HOLDERMAN |
| | ) | MAG. JUDGE NOLAN |

## NOTICE OF FILING QUI TAM COMPLAINT

Robin Potter (ARDC #3123932)
robinpotter@igc.org
Denise M. Kelleher (#6286565)
dkelleher@robinpotter.org
Robin Potter & Associates
111 E. Wacker, Suite 2600
Chicago, Illinois 60601
Telephone: (312) 861-1800

Brad Pigott (Miss. Bar No. 4350)
bpigott@prjlawyers.com
Cliff Johnson
cjohnson@prjlawyers.COM
Pigott Reeves Johnson, P.A.
775 N. Congress Street
Post Office Box 22725
Jackson, Mississippi 39501
Telephone: (601) 354-2121

Timothy J. Matusheski (Miss. Bar No. 100998)
George W. Healy, IV, and Associates
2224 25th Avenue
Gulfport, MS 39501
Telephone: (228) 575-4005

NOF Suppressed v. Suppressed.Complaint.wpd

## IN THE UNITED STATES DISTRICT COURT
## FOR NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. JENNIFER S. SHULTZ, | ) ) ) | Chief Judge James Holderman |
| Plaintiffs, | ) ) | Case No. |
| v. | ) ) ) | **FILED IN CAMERA AND UNDER SEAL UNDER THE FALSE CLAIMS ACT** |
| DEVRY, INC. | ) ) | JURY DEMANDED |
| Defendants. | ) | |

## COMPLAINT

Comes now *Qui Tam* relator Jennifer Shultz, and alleges the following as her Complaint herein, to be filed UNDER SEAL pursuant to 31 U.S.C. § 3730(b)(2):

### INTRODUCTION

1.     This is a civil action brought against Defendant DeVry, Inc. ("DeVry"), and on behalf of the United States of America pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3732 (as amended by the False Claims Act Amendments of 1986), to recover damages and civil penalties from DeVry.

### Venue and Jurisdiction

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345 and 31 U.S.C. § 3730(b).

3.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), and 31 U.S.C. § 3732(a) as the Defendant has during all relevant times maintained its corporate headquarters in, and has directed the conduct which is the subject of this action from, the Northern District of Illinois.

**The Parties**

4.     Relator Jennifer Shultz is an adult resident citizen of Hilliard, Ohio. She was employed by the Defendant DeVry as a student recruiter from January of 2002 until approximately November of 2003. In that capacity, she worked within the Admissions Department at DeVry. In the course of her work, Relator became familiar with the marketing activities of DeVry conducted throughout the United States to recruit students to enroll at "colleges" owned and controlled by DeVry.

5.     Defendant DeVry is a publicly-traded corporation, organized under the laws of the State of Delaware. At all periods relevant to this case DeVry has maintained its corporate headquarters and principal place of business at One Tower Lane, Oakbrook Terrace, Illinois. DeVry's headquarters are located within this District. This is also the location from which DeVry devised the compensation schemes and related practices challenged in this action.

6.     Since its formation in 1987, DeVry has become one of the largest for-profit post-secondary educational enterprises in the United States. DeVry's current total enrollments exceeds 50,000 students. DeVry owns and runs such educational institutions under the names of DeVry University, Ross University, Chamberlain College of Nursing, and Becker Professional Review. DeVry's "campuses" within Illinois include facilities located in Addison, Chicago (and "Chicago Loop" and "Chicago O'Hare"), Elgin, Gurnee, Lincolnshire, Naperville, Oak Brook, Schaumburg, and Tinley Park.

7.     The United States of America is named as a Plaintiff herein pursuant to the False Claims Act. As a result of the false statements and false claims alleged in this Complaint that were made by or on behalf of (or caused by) DeVry, funds of the

Complaint.final.wpd
September 26, 2007/rbp                              -2-

United States through the United States Department of Education ("DOEd") were directly or indirectly disbursed and awarded to Defendant. The funds were disbursed and awarded pursuant to the Higher Education Act, 20 U.S.C. §§ 1071 *et seq.*, Title IV ("HEA") .

**Conditions for DeVry's Entitlement to Proceeds of Federal Title IV Loans**

8.      DeVry, and/or its units or subsidiaries directly or indirectly received federal or federally-guaranteed student loans or grants made pursuant to the HEA. These funds provided DeVry with approximately 75% of its revenues from United States undergraduate tuition, book, and fee sources. A substantial majority of the students recruited to and enrolled in DeVry institutions receive federally-supported financial aid funded pursuant to Title IV. Proceeds from all such Title IV loans are disbursed to DeVry and other purportedly eligible post-secondary institutions and not to student borrowers.

9.      As a legal prerequisite and condition to any legal entitlement to receive HEA Title IV loan or grant proceeds, each of the DeVry-owned and/or controlled "colleges" (or other "institutions") is required by statute and DOEd regulations to make certain explicit certifications on the face of a "Program Participation Agreement" ("PPA"). The PPA is entered into between the DOEd and each such school. The PPAs make it clear to the signatory institutional representative that "(t)he execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program."

10.    Among the explicit certifications and statements signed by and/or on

behalf of each DeVry-controlled institution as a prerequisite for participation in the Title

IV program, was the following certification that the DeVry institution

> "will not provide, nor contract with any entity that provides, any
> commission, bonus, or other incentive payment based directly or indirectly
> on success in securing enrollments or financial aid to any persons or
> entities engaged in any student recruiting or admission activities or in
> making decisions regarding the awarding of student financial assistance,
> except that this requirement shall not apply to the recruitment of foreign
> students residing in foreign countries who are not eligible to receive
> Federal student assistance. This provision does not apply to the giving of
> token gifts to students or alumni for referring students for admission to the
> institution as long as the gift is not in the form of money, check, or money
> order; no more than one such gift is given to any student or alumnus; and
> the gift has a value of not more than $25."

(The above quoted language concerning "recruitment of foreign students" does not

apply to the claims asserted herein insofar as this case does not involve Title IV loans

to foreign students.)

11.    DeVry's certification on each PPA it executed and/or submitted

constituted an explicit representation that defendant did then and intended to continue

to obey the statute.  DeVry's certification acknowledged its compliance with the

statutory provision that every such PPA shall "condition the initial and continuing

eligibility of an institution to participate in a program upon compliance with the following

requirements".  20 U.S.C. § 1094(a)(20).  The statutory requirements include that

> "[T]he institution will not provide any commission, bonus, or other
> incentive payment based directly or indirectly on success in securing
> enrollments or financial aid to any persons or entities engaged in any
> student recruiting or admission activities or in making decisions regarding
> the award of student financial assistance, except that this paragraph shall
> not apply to the recruitment of foreign students residing in foreign
> countries who are not eligible to receive Federal student assistance."

12.     The prohibition set forth in paragraph 11, *infra* will be referred to hereafter as "the enrollment recruitment incentives prohibition." The enrollment recruitment incentives prohibition is an essential and core part of the congressional policies behind the Title IV program.  Title IV was designed by Congress and the DOEd to protect the fiscal integrity and the educational effectiveness of the Title IV program.  One way the Congress sought to insure the integrity of the Title IV program and funds was to remove incentives for post-secondary institutions to recruit and/or enroll persons who are not likely to successfully complete the academic programs of the institution.  In the case of student loans, the Congress intended to remove incentives to recruit and/or enroll persons who are not likely to be able and/or willing to re-pay their federal loans.

13.     The enrollment recruitment incentives prohibition is re-stated by the DOEd in its regulations at 34 C.F.R. § 668.14(22)(i).  The DOEd regulation also describes twelve different "activities and arrangements that an institution may carry out without violating the provisions" of the enrollment recruitment incentives prohibition. 34 C.F.R. § 668.14(22)(ii).  None of the DOEd's twelve categories of permissible activities or safe harbors is involved in this case.  The "safe harbor" exceptions set forth in the DOEd regulations involve compensation:

    (a)    to persons other than recruiters (or their managers or supervisors) employed by DeVry, or

    (b)    compensation involving enrollment in programs not even eligible for any Title IV loan, or

    (c)    compensation involving employers who pay their employees' tuition, or

    (d)    uniform corporate-wide profit sharing distributions, or

    (e)    fixed compensation adjustments made every six or twelve months (but not more often), or

    (f)    compensation paid for internet-based admission activities, or

    (g)    compensation based on students successfully graduating or completing an entire academic year of study at a DeVry-owned institution.

14. Throughout its participation in the Title IV program, DeVry and all of its DeVry-owned "colleges" knew, should have known and continue to know that compliance with the terms of the enrollment recruitment incentives prohibition was re-stated in their certifications in DeVry's own PPA Agreements, as well as in the Title IV statutes and regulations themselves.

15. At all relevant times to this Complaint, DeVry and its colleges knew, should have known and continue to know that compliance with the terms of the enrollment recruitment incentives prohibition was a legal prerequisite to and integral to their entitlement to Title IV proceeds. Defendant knew or should have known that it was not entitled to the proceeds of any loan application made by individual or prospective student to the DOEd, its agents or Guaranty Agency absent compliance with the prohibition.

## DeVry Knowingly Violated the Enrollment Recruitment Incentives Prohibition

16. Throughout the entire decade preceding the filing of this action, DeVry and its management knew or should have known that they were in continual violation of the enrollment recruitment incentives prohibition. DeVry knew or should have known it was in violation of the prohibition when they caused to be presented and submitted each Title IV loan or grant application on behalf of each student who purported to be eligible to serve as borrowers of such loans (or beneficiaries of such grants). DeVry management knew that it was the systematic and continual corporate policy of DeVry to engage in compensation schemes that violated the enrollment recruitment incentive prohibition.

17.     Throughout all periods relevant to this case, DeVry has caused and directed its institutions to pay (or to withhold) additional compensation to its individual "Admissions Advisor" recruiters (hereafter "AA" or "AA's"), and to promote (and demote) such AA's based on the numbers or levels of "starts" the AA achieved. The term "start" as used by DeVry and herein means an enrollment by a single prospective student and his/her attendance during at least one day of classes at the DeVry institution. A"start" did not require or mean that the student graduated or otherwise successfully completed an educational course from any particular educational program.

18.     As a substantial part of its compensation scheme for rewarding AA's with additional compensation based on the numbers of "starts" they achieved, DeVry required specified numbers of "starts" by the AA to remain employed as an "Associate 1". At times DeVry required AA to have "up to 120 starts" annually. DeVry required additional starts if the AA was to be paid additional compensation or to hold the title of "Advisor II". DeVry required the Advisor II to have during some periods, "121-130 starts" annually. DeVry required additional starts if the Advisor II was to be paid additional compensation or to hold the title of "Advisor III". DeVry required the Advisor III to have during some periods, "131-145 starts" annually. DeVry required additional starts if the Advisor III was to be paid additional compensation or to hold the title of "Advisor IV". DeVry required the Advisor IV to have during some periods, "146-165 starts" annually. DeVry required additional starts if the Advisor IV was to be paid additional compensation as a "Senior Advisor". DeVry required the Senior Advisor during some periods to have more than 165 starts annually.

Complaint.final.wpd
September 28, 2007/rbp

-7-

19.    In the decade preceding the filing of this Complaint, as a principal means

of incentivizing and/or motivating DeVry AA's to recruit and enroll more students,

defendant maintained a "PRIDE" motivational program. Under its "PRIDE" program,

DeVry promised to and did pay each individual AA-recruiter receive additional or bonus

compensation per year, in addition to their fixed salary. DeVry's "PRIDE" payments

were made to the individual recruiter who caused or was responsible for a specified

number of "starts" or "met PRIDE" targets for the year involved. As one example, DeVry

required an individual recruiter to be responsible for at least 145 "total starts" in order to

"make PRIDE" in 2003 and thus receive the additional compensation linked to "PRIDE

Membership".

20.    If an individual DeVry recruiter or AA "met PRIDE" by causing (or being

treated or regarded by supervisors as having caused) their required target number of

starts during the year (or other "start period") involved, DeVry would pay for that

recruiter (and that recruiter's spouse or other guest) to fly to an annual "PRIDE"

celebration at a designated city, for the recruiter (and spouse or guest) to stay at a

designated expensive hotel at DeVry's expense, and for the recruiter (and spouse or

guest) to eat during the "PRIDE" celebration at DeVry's expense. One year, believed to

be in approximately December of 2003, the DeVry all-expense-paid trip for all "PRIDE

Members" who met their designated "PRIDE Start Targets" was in Chicago, Illinois.

One year, the same annual trip occurred in December in Miami, Florida.

21.    Eligibility for attending defendant's "PRIDE Meeting" at DeVry's expense

depended entirely on whether or not the individual DeVry recruiter met their annual

PRIDE target of starts. Most DeVry recruiters did not receive the "PRIDE Meeting"

bonus compensation because most did not "make PRIDE" by achieving the level of "starts" required to receive the additional "PRIDE" compensation.

22.     As additional compensation resulting each year to each individual "PRIDE Member" who met their designated "start" target, the recruiter who thereby became a "PRIDE Member" for that year also received a cash bonus paid to them by DeVry. In 2003, for instance, each individual "PRIDE Member" received $1,000.00 in cash in an envelope delivered to each individual PRIDE Member's hotel room in the course of the annual "PRIDE Meeting". Relator believes that the2003 "PRIDE" meeting occurred in Chicago, Illinois in December of 2003.

23.     Each year, each individual"PRIDE Member" who met their designated "start" target for the year was given further additional compensation by defendant. The "PRIDE member" recruiter was allowed by DeVry to look through a catalogue of alternative gifts supplied by DeVry, and to select an item that was in fact purchased by and at DeVry's expense for the "PRIDE Member." Alternative gifts available only to "PRIDE Members" each year were not of nominal value, and included expensive wrist watches, items of luggage, and household fixtures such as lamps.

24.     The bonus compensation "PRIDE Member" program of DeVry was heavily and consistently emphasized by DeVry recruitment executives through weekly (i.e. Friday morning) sales meetings held within the Admissions Department of each DeVry campus. As such, executives regularly announced to their entire "team" of recruiters at defendant's weekly meetings the number of additional "starts" which each recruiter needed to "Make PRIDE" and to receive the year-end additional compensation and other "amenities". The "PRIDE" and additional compensation was earned entirely

through achieving credit for the designated number of "starts" for the year or other period involved.

25.     At the time of signing each of its PPA agreements with the DOEd, DeVry (and its institutional units or "colleges") knew that its certifications of compliance with the enrollment recruitment incentives prohibition were false. DeVry knew that it had no intent or purpose of changing its recruitment compensation practices to comply with the prohibition. Accordingly, DeVry signed and entered each of its PPA agreements fraudulently, intending fraudulently to induce the DOEd to treat DeVry as an eligible institution for purposes of getting payments from DOEd in response to loan and grant applications. DeVry induced DOEd payments when DeVry knew that it did not meet (and had no intention or plan to meet) the conditions and prerequisites for serving as an eligible institution. By signing its PPA agreements, DeVry intended specifically to deceive the DOEd.

26.     DeVry throughout its maintenance of the "PRIDE Member" bonus compensation program has used various terms and documents fraudulently to obscure and hide its recruitment compensation practices committed in violation of the enrollment recruitment incentives prohibition. In fact, the financial rewards for individual recruiters were contingent on and tied directly to the individual recruiters' statistical level of success in causing specified levels of enrollments (or "starts").

27.     DeVry has also instructed its recruiters not to communicate the true facts of its "PRIDE Member" compensation program to persons not employed by DeVry. DeVry's purpose has been to obscure and hide from the DOEd its numbers-drive compensation system, including the "PRIDE Member" program itself.

**False Claims Caused by DeVry**

28.     During the decade immediately preceding the filing of this Complaint,

DeVry has continually caused its "colleges" and other units to make, and has caused

individual prospective students recruited by DeVry to make, applications directly to the

DOEd seeking and claiming entitlement to funds from Pell Grants (pursuant to 20

U.S.C. § 1070a *et seq.*) and from Federal Supplemental Educational Opportunity

("FSEOG") Grants (pursuant to 20 U.S.C. § IQ70b *et seq.*), to fund the education of

individual students.  Grant proceeds from all such applications for all such grants were

disbursed to DeVry or to one of its units or subsidiaries.  As a part of each such

application or claim for each such grant, DeVry has caused a knowingly false

representation to be made to the DOEd that DeVry (or the DeVry-controlled institution

to which the prospective student has been recruited) was at that time an eligible

institution then in compliance with a valid PPA. As DeVry has known throughout its

existence, continuing compliance with the terms of its PPA, including the enrollment

recruitment incentives prohibition, has continually been a prerequisite and precondition

for any entitlement on the part of DeVry or any of its units or subsidiaries to receive any

such grant proceeds. Since August of 2001, DeVry has caused 149,978 Pell Grants to

be paid by the DOEd in reliance on and response to such claims and representations,

resulting in payments to DeVry, during the above period of approximately

$323,172,332.00 in Pell Grant proceeds alone.

29.     Throughout the decade immediately preceding the filing of this Complaint,

DeVry has continually caused its "colleges" and other educational units to make, and

has caused individual prospective students recruited by DeVry to make, applications
directly to the DOEd seeking and claiming entitlement to funds as a result of student
loans made directly by the DOED pursuant to the Federal Direct Student Loan Program
(pursuant to 20 U.S.C. § 1087a *et seq.*), to fund the education of individual students at
a DeVry "college". Loan proceeds resulting from all such direct loan applications were
disbursed to DeVry or to one of its units or subsidiaries. As a part of each such
application or claim for each such direct loan, DeVry has caused a knowingly false
representation to be made to the DOEd that DeVry (or the DeVry-controlled institution
to which the prospective student has been recruited) was at that time an eligible
institution then in compliance with a valid PPA. As DeVry has known throughout its
existence, continuing compliance with the terms of its PPA, including the enrollment
recruitment incentives prohibition, has continually been a prerequisite and precondition
for any entitlement on the part of DeVry or any of its units or subsidiaries to receive any
such grant proceeds.

30.     Throughout the decade immediately preceding the filing of this Compliant,
DeVry has continually caused its "colleges" and other educational units to make, and
has caused individual prospective students recruited by DeVry to make, applications to
private lenders for loan proceeds, to be disbursed to DeVry or to one of its units or
subsidiaries, from loans made under the Federal Family Education Loan Program
("FFELP"). The FFELP in turn includes federally subsidized (and unsubsidized)
"Stafford Loans" (on which the DOEd directly or indirectly pays interest during in-school
or other deferment and forebearance periods), Federal PLUS loans (directly to parents

of dependent undergraduate college students), Perkins Loans (to students with substantial financial need), and Federal Consolidation Loans. When any such FFELP loan has been the subject of a default, DeVry in turn has caused the private lender to represent falsely that DeVry was then an eligible institution in compliance with its PPA, and to claim and receive an insurance payment by the DOEd or by one of the Guaranty Agencies acting as agent of the DOEd and with DOEd funds, pursuant to the DOEd guaranty behind each such FFELP loan obligation. As DeVry has known throughout its existence, continuing compliance by it and by its units with the terms of its PPA, including the enrollment recruitment incentives prohibition, has continually been a prerequisite and precondition for any entitlement on the part of any lender to receive any such insurance proceeds.

31.    DeVry knew at the time of each such application for each such Title IV grant or loan (or loan guaranty insurance, interest, or special allowance  claim) that its continuing compliance with and obedience to the enrollment recruitment incentives prohibition was a precondition of, was material to, and was integral to any entitlement of DeVry (or any private lender) to be paid with funds of the DOEd.  DeVry also knew that it was not in compliance with the enrollment recruitment incentives prohibition, had not been in compliance at the time of the most recent signing of its PPA, and had no intention and no plan to come into compliance. DeVry therefore knew at the time of each such application (or insurance claim) that each such claim was factually and legally false.

32.    DeVry knew at the time of each such application for each such Title IV grant or loan (or loan guaranty insurance claim) that it was using its purported status as

an eligible institution as a part of each such claim or application. DeVry knew that it was therefore using (or causing to be used) its false representations in its underlying PPA (of compliance with the enrollment recruitment incentives prohibition), as a legally necessary, material, and integral part of, condition of, and cause of, each such application or claim for Title IV grant or loan funds directly or indirectly from the DOEd. Each such actual or implied use of DeVry's representations and certifications in its PPA was known by DeVry to be integral to the causal chain leading to the making of each disbursement directly or indirectly to DeVry as a result of each such false claim.

### Count I - Causing Knowingly False Claims to be Paid

33.    This is a claim on behalf of the United States of America under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended, specifically for violations of Section 3729(a)(1) thereof.

34.    The Plaintiff hereby re-alleges and incorporates by reference all allegations contained in Paragraphs 1 through 33 above.

35.    In performing all of the acts set out herein, Defendant DeVry knowingly caused to be presented, to the DOEd (or to Guaranty Agencies operating as agents of and with funds of the DOEd) and to other officers, employees or agents of the United States, false claims and fraudulent claims for approval and payment out of the funds of the United States, and caused losses to the United States in the amounts of those payments, for grant proceeds, loan proceeds, interest subsidies, special allowance payments, and loan insurance guaranty payments, as to each and every such claim and payment proceeds of which were disbursed directly or indirectly to

DeVry or to any of its units or colleges (or, as to insurance guaranty payments, any lender to any enrollee of any DeVry institution), since the date when DeVry first started causing such claims to be made (or since the date when DeVry first decided to engage in conduct in violation of the enrollment recruitment incentives prohibition as defined above), all in violation of 31 U.S.C. § 3729(a)(1).

36.    By virtue of and as a result and cause of the false claims presented or caused to be presented by DeVry, the United States of America has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as determined appropriate from the evidence to be presented at the trial hereof.

### Count II - Knowing Use of False Statements to Get False Claims Paid

37.    This is a claim on behalf of the United States of America under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended, specifically for violations of Section 3729(a)(2) thereof.

38.    The Plaintiff hereby re-alleges and incorporates by reference all allegations contained in Paragraphs 1 through 36 above.

39.    In performing all of the acts set out herein, Defendant DeVry knowingly used and caused false and fraudulent PPA certifications, and other representations that DeVry-controlled institutions were institutions eligible to receive proceeds from related DOEd programs, and other false and fraudulent records, to be used as an integral part of the process of and conditions for causing false and

fraudulent claims to be made to the DOEd (or to Guaranty Agencies operating as

agents of and with funds of the DOEd) and to other officers, employees or agents of the

United States, for grant proceeds, loan proceeds, interest subsidies, special allowance

payments, and loan insurance guaranty payments, as to each and every such claim

and payment, proceeds of which were disbursed directly or indirectly to DeVry or to any

of its units or colleges (or, as to insurance guaranty payments, any lender to any

enrollee of any DeVry institution), since the date when DeVry first started causing such

claims to be made (or since the date when DeVry first decided to engage in conduct in

violation of the enrollment recruitment incentives prohibition as defined above), all in

violation of 31 U.S.C. § 3729(a)(2).

40.     By virtue of and as a result and cause of the false claims presented or

caused to be presented by DeVry with the use of such statements and records, the

United States of America has suffered actual damages and is entitled to recover three

times the amount by which it is damaged, plus civil money penalties of not less than

$5,500 and not more than $11,000 for each of the false claims presented or caused to

be presented, and other monetary relief as determined appropriate from the evidence to

be presented at the trial hereof.

### Count III - Using False Certifications and Other Statements to Avoid Obligations to Re-Pay Funds to DOEd

41.     This is a claim on behalf of the United States of America under the False

Claims Act, 31 U.S.C. §§ 3729-33, as amended, specifically for violations of Section

3729(a)(7) thereof.

42.     The Plaintiff hereby re-alleges and incorporates by reference all allegations contained in Paragraphs 1 through 40 above.

43.     In performing all of the acts set out herein, Defendant DeVry knowingly used and caused false and fraudulent PPA certifications, and other representations that DeVry-controlled institutions were institutions eligible to receive proceeds from related DOEd programs, and other false and fraudulent records, to be used as an integral part of the process of and conditions for causing false and fraudulent claims to be made to the DOEd (or to Guaranty Agencies operating as agents of and with funds of the DOEd) and to other officers, employees or agents of the United States, for grant proceeds, loan proceeds, interest subsidies, special allowance payments, and loan insurance guaranty payments, in order to be treated by the DOEd as an eligible institution for the lawful receipt of such payments, and in order to avoid the obligation to return or refund to the DOEd funds received during periods of time when in fact DeVry, because of its violations of the enrollment recruitment incentives prohibition, was not an eligible institution, and thus all funds received directly or indirectly by DeVry from the DOEd since the date when DeVry first decided to engage in conduct in violation of that prohibition, all in violation of 31 U.S.C. § 3729(a)(7).

44.     By virtue of and as a result and cause of the false claims presented or caused to be presented by DeVry with the use of such statements and records, and the use by DeVry of false statements to conceal DeVry's obligation to return or refund all such payments received by DeVry, the United States of America has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the

false claims presented or caused to be presented, and other monetary relief as
determined appropriate from the evidence to be presented at the trial hereof.

### PRAYER FOR RELIEF

**WHEREFORE,** the United States of America demands and prays that judgment
be entered in favor of the United States of America:

1.       On Counts I-III under the False Claims Act against DeVry for three
times (or "treble") the amount of funds paid directly or indirectly by the DOEd to DeVry
(and to any unit or institution owned or controlled by DeVry), and to any private lender
which received insurance guaranty payments, or special allowance payments, or
interest payments, as to loans the original proceeds of which were disbursed directly or
indirectly to an institution owned or controlled by DeVry, plus all investigative costs, and
all civil penalties as are allowable by law for each false claim, and for costs of this civil
action; and

2.       For such other relief as the Court deems just and equitable.

**WHEREFORE,** Relator Jennifer S. Shultz demands and prays that judgment be
entered in her favor as follows:

1.       On Counts I-III under the False Claims Act, for a percentage of all civil
penalties and damages obtained from DeVry pursuant to 31 U.S.C. § 3730;

2.       Reasonable attorneys' fees, and all costs incurred in the prosecution of
this action against the Defendant; and

3.       Such other relief as the Court deems just and proper.

Respectfully submitted,

By: /s/ Robin Potter
One of Plaintiff's Attorneys

Robin Potter (ARDC #3123932)
robinpotter@igc.org
Denise M. Kelleher (#6286565)
dkelleher@robinpotter.org
Robin Potter & Associates
111 E. Wacker, Suite 2600
Chicago, Illinois 60601
Telephone: (312) 861-1800

Brad Pigott (Miss. Bar No. 4350)
bpigott@prjlawyers.com
Cliff Johnson
cjohnson@prjlawyers.COM
Pigott Reeves Johnson, P.A.
775 N. Congress Street
Post Office Box 22725
Jackson, Mississippi 39501
Telephone: (601) 354-2121

Timothy J. Matusheski (Miss. Bar No. 100998)
George W. Healy, IV, and Associates
2224 25th Avenue
Gulfport, MS 39501
Telephone: (228) 575-4005

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing **COMPLAINT** was filed *in camera* and *under seal* pursuant to the False Claims Act and was served upon all parties listed on the attached service list as noted or by placing the same in the United States Postal depository located at 111 East Wacker Drive, Chicago, Illinois, before 5:00 p.m. on this 26th day of September, 2007, with First Class postage prepaid, addressed as follows:

Linda A. Wawzenski,
Assistant U. S. Attorney and Deputy Chief
Civil Division-Illinois
Eastern Division of the Northern District
Office of the U. S. Attorney
219 South Dearborn Street
Suite 500
Chicago, Illinois 60604
**By Hand-Delivery**

The Honorable Peter D. Keisler
Attorney General of the United States
U. S. Department of Justice
950 Pennsylvania Avenue, N.W.
Room 4400
Washington, D.C. 20530-0001
**By First Class Mail**

Robin Potter

cos.complaint.wpd